# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1381V
UNPUBLISHED

| | |
|---|---|
| PATRICIA VALLEE, Administrator of ESTATE OF EDWARD VALLEE,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: July 27, 2023<br><br>Special Processing Unit (SPU); Ruling on the Record; Damages; Influenza (Flu) Vaccine; Guillain-Barré Syndrome (GBS) |

*Ronald Craig Homer*, Conway, Homer, P.C., Boston, MA, for petitioner.

*Jennifer A. Shah*, U.S. Department of Justice, Washington, DC, for respondent.

## **DECISION AWARDING DAMAGES**[1]

On October 13, 2020, Edward Vallee[2] filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq*.[3] (the "Vaccine Act"). Petitioner alleged that Mr. Vallee suffered from Guillain Barré syndrome ("GBS") caused by an influenza ("flu") vaccine administered on November 2, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"), and entitlement was found in the Petitioner's favor on June

---

[1] Because this unpublished fact ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the fact ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Mr. Vallee passed away from other causes, and Patricia Vallee was substituted in as Petitioner on December 6, 2021. ECF No. 46.

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

21, 2021. The parties reached on impasse on the appropriate award for pain and suffering from Mr. Vallee's injury, however, so the matter was submitted for an SPU "Motions Day" hearing.

For the reasons described below, I award **$160,000.00** in damages, representing compensation for actual pain and suffering, plus **$2,090.30** representing unreimbursed expenses.

### I.     Medical Records

Prior to receiving the flu vaccine, Mr. Vallee's medical history included several chronic conditions, including hypertension, hyperlipidemia, coronary artery disease, kidney disease, and diabetes. Ex. 5 at 327. Additionally, he had bilateral subdural hematomas that required several surgeries approximately eight months prior to his vaccination that resulted in chronic weakness, pain, and fatigue. Ex. 12 at 1198-99.

Mr. Vallee received a flu vaccine on November 2, 2018. Ex. 1 at 1; Ex. 5 at 214. At that time, he reported that he still had some symptoms associated with his subdural hematomas, including an unsteady gait that was improving, and fatigue. Ex. 5 at 207, 214.

On November 15, 2018 (thirteen days after his vaccination), Mr. Vallee presented to the emergency department complaining of weakness in his extremities that began one week earlier. Ex. 8 at 302. He reported that he had weakness and chronic pain with walking since the March surgery. *Id.* at 303-09. However, his weakness and fatigue had increased markedly following his flu shot, stating that "he normally performs 18 push-ups, but could only do 3 last week." *Id.* at 302. A lumber puncture indicted elevated protein in his cerebral spinal fluid, and he was diagnosed with GBS. *Id.* at 305. Mr. Vallee was hospitalized from November 15-19 and underwent a 5-day course of IVIG. *Id.* at 39-41.[4]

Mr. Vallee began out-patient physical therapy on December 4, 2018. Ex. 8 at 1052. At that time, he required the use of a walker and had lower extremity weakness but was able to get into bed alone and had reportedly "fair" balance. *Id.* at 1052. From December 4, 2018, through July 10, 2019, Mr. Vallee attended fifty-one physical therapy sessions. *Id.* at 1012-17; 1048, 1050-51, 1056; Ex. 21 at 91, 93-106.

On December 18, 2018, Mr. Vallee had a follow-up at his primary care clinic. Ex. 5 at 150. He reported continued left leg weakness and the need to use a walker. *Id.* He

---

[4] Mr. Vallee was also treated for an antibiotic-resistant urinary tract infection during his hospital stay. Ex. 8 at 39.

also was reportedly attending physical therapy sessions twice a week. On January 4, 2019, Mr. Valle began occupational therapy. Ex. 8 at 29. He continued to report weakness in his extremities and fatigue. *Id.* Between January 4, 2019 and April 3, 2019, he attended seventeen occupational therapy sessions. *Id.* at 29, 61-62, 64-65, 67-68, 70-73.

Mr. Vallee presented to the emergency department for worsening weakness on January 7, 2019. Ex. 8 at 833. His weakness was thought to be related to a urinary tract infection and not a GBS relapse. *Id.* at 656. He then saw Dr. Herminio Cuervo, a neurologist, on February 7, 2019. He reported constant and severe numbness, tingling, and weakness that was more pronounced on his left side. Ex. 6 at 69-72. A follow-up with Dr. Cuervo on April 23, 2019, noted that Mr. Vallee was making slow progress, and that he had regained "most of the strength in the left arm and hand." He was diagnosed with sequelae of GBS and diabetic polyneuropathy. *Id.* at 66-67. Mr. Vallee indicated that he continued to attend physical therapy twice weekly. A third follow-up with Dr. Cuervo on August 15, 2019, indicated Mr. Vallee continued to improve but still exhibited weakness and balance issues. *Id.* at 61-262.

On January 9, 2020, Mr. Vallee again saw Dr. Cuervo, who noted he still had weakness and diminished reflexes, but that he "continues to recover slowly." Ex. 6 at 55-56. By May 19, 2020, Mr. Vallee reported ongoing weakness in his left side, but his left arm had improved significantly. Ex. 17 at 36. His symptoms continued to linger however, and on November 18, 2020 he reported weakness and fatigue to Dr. Cuervo. Further, Mr. Vallee stated that "[h]e wants to get over his GBS." *Id.* at 31-33; see also Ex. 15 at 52 (reports of fatigue and weakness from January 4, 2021).

Mr. Vallee saw Dr. Cuervo on May 12, 2021. He reported continued frustration, lack of energy, and left-sided weakness. Ex. 14 at 1-5. Additionally, he was still utilizing a walker for mobility.

On August 9, 2021, Mr. Vallee passed away. Ex. 22. His cause of death was acute coronary syndrome, and GBS was listed as a significant condition contributing to, but not the cause of, his death.[5]

## II.     Affidavit Evidence

Mr. Vallee's wife submitted an affidavit in support of this petition on December 13, 2021. Ex. 16. She stated that she and her husband were competitive dancers, and after

---

[5] Additional significant contributing conditions included diabetes, coronary artery disease, and kidney disease. Ex. 2 at 2.

3

Mr. Vallee recovered after he had blood clots removed from his head. *Id.* at 2. She also described Mr. Vallee's course of treatment, and how his GBS impacted the last years of his life. *Id.* at 2-4.

### III.     Damages

The sole contested damages component to be decided is pain and suffering. Petitioner filed a memorandum in support of damages on June 10, 2022, seeking $180,000.00 for pain and suffering and $2,090.30 for unreimbursed expenses. Petitioner's Memorandum in Support of Damages ("Pet. Br."), ECF No. 60. Respondent reacted with his own brief on August 10, 2022, arguing that $106,500.00 is an appropriate amount for pain and suffering, but not disputing the unreimbursed expenses. Respondent's Response to Petitioner's Memorandum on Damages ("Res. Br."), ECF No. 63. Petitioner filed a reply on September 6, 2022. Petitioner's Reply to Respondent's Response to Petitioner's Brief in Support of Damages ("Reply"), ECF No. 64.

### IV.     Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).[6] Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health*

---

[6] Petitioner does not make the claim for the Vaccine Act's $250,000.00 Death Benefit. Pet. Br. at 24.

*& Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[7] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum (between zero and the $250,000.00 cap), that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The Court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, pain and suffering should be assessed by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. While *Graves* does not control the process used herein to calculate pain and suffering, it stands as wise counsel.

### V.     Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Mr. Vallee was a competent adult with no impairments that would impact the awareness of his injury. Therefore, my analysis focuses primarily on the severity and duration of Mr. Vallee's injury.

When performing this analysis, I review the record as a whole, including the medical records and affidavits filed, all assertions made by the parties in written documents, and the arguments presented during the Motions Day hearing. Petitioner

---

[7] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

cites to a number of damages decisions involving GBS injuries that resulted in $180,000.00 awards.[8] Pet. Br. at 23. Petitioner notes that Mr. Vallee's treatment included a five-day course of hospitalization, a lumbar puncture, IVIG, and significant physical therapy over the last three years of his life. Pet. Br. at 17-22.

Respondent argues that the severity of Mr. Vallee's GBS was less than what is evident from previous cases, and should be assessed in light of his pre- and post-vaccine comorbidities. Res. Br. at 8-9. Respondent notes that the cases cited by Petitioner involved substantially longer hospitalizations, intensive therapies, and petitioners that did not have pre-existing medical conditions that complicated recovery. *Id.* at 9-10. He also cites to *Bircheat v. Sec'y of Health & Hum Servs.* as a comparable case. No. 19-1088V, 2021 WL 3026880 (Fed. Cl. Spec. Mstr. June 16, 2021) (awarding $170,000.00 for pain and suffering). Respondent notes that the petitioner in *Bircheat* had a more severe course of treatment, consisting of seven days of hospitalization, a feeding tube, twenty-four days at an inpatient rehabilitation facility, and long-term reports of severe neuropathic pain. *Id.* at *2.

After reviewing the record in this case, the evidence best supports the conclusion that Mr. Vallee experienced the onset of GBS in November 2018, followed by a moderate, if prolonged, course of treatment. He was fortunate to receive a relatively prompt diagnosis and appropriate treatment with IVIg. He was in the hospital for five days but and not require in-patient therapy. However, Mr. Vallee underwent an extensive course of therapy after his hospital stay, consisting of sixty-eight therapy (including both physical therapy and occupational therapy) sessions over approximately seven months.

Mr. Vallee gradually improved over the next several years. However, he required supportive devices to ambulate and reported weakness, fatigue, and numbness until his death on August 9, 2021. While the course of his injury was not as severe as other GBS cases, I give some weight to the fact that the last three years of his life were occupied with his recovery.

Respondent contends that Mr. Vallee's comorbidities support a significantly lower award than most GBS cases, arguing that his pain and suffering was not solely due to his

---

[8] In particular, Petitioner cited to *McCray v. Sec'y of Health & Hum. Servs.*, No. 19-0277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug 31, 2021); *Cegielski v. Sec'y of Health & Hum. Servs.*, No. 17-0570V, 2021 WL 1440205 (Fed. Cl. Spec. Mstr. Mar. 16, 2021); *Fedewa v. Sec'y of Health & Hum. Servs.*, 17-1808V (Fed. Cl. Spec. Mstr. March 26, 2020); *Presley v. Sec'y of Health & Hum. Servs.*, No. 17-1888V, 2020 WL 1898856 (Fed. Cl. Spec. Mstr. Mar. 23, 2020) (awarding $180,000 for pain and suffering); *Devlin v. Sec'y of Health & Hum. Servs.*, 19-191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr. Aug. 7, 2020); and *Johnson v. Sec'y of Health & Hum. Servs.*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 for pain and suffering). Pet. Br. at 23.

GBS. Res. Br. at 8-9. I recognize that his concurrent conditions complicated his GBS, but the mere fact that a claimant had pre-vaccination comorbidities does not per se diminish the impact of injury on his life – especially one as alarming and potentially life-altering as GBS – and therefore is not alone a reason for a lower award. Those comorbidities are still relevant to pain and suffering, since their ongoing nature means that not all of his post-vaccination suffering can in fact be attributed to the vaccine injury – but at the same time the additional suffering imposed by the vaccine-caused GBS warrants recognition in the total award.

Respondent's proposed award of $106,500.00 does not give sufficient credence to the seriousness of GBS as a general matter, or to the facts of this specific case. Although Mr. Vallee did experience a relatively mild initial course of treatment, he had significant therapy thereafter and lingering sequela including weakness, fatigue, and the need of a walker until his death approximately three years later.

Petitioner has far better substantiated her demand than Respondent. And the number he seeks reasonably balances the seriousness of GBS generally and the relatively invasive nature of Mr. Vallee's treatment. However, I do agree with Respondent's contention that the present facts are not directly comparable to the damages determinations cited by Petitioner. In such cases, where pain and suffering awards were $180,000.00, the injured party experienced an identifiable effect on their career, life, or daily living, which is harder to show here due to Mr. Vallee's status as a retired individual with significant comorbidities. *See, e.g. Dillenbeck* 2019 WL 4072069, at *14; *Devlin*, 2020 WL 5512505 at *3; *Francesco*, 2020 WL 6705564 at *4; *W.B.*, 2020 WL 5509686 at *5.

Mr. Vallee's situation is most similar to the petitioner in *Turner v. Sec'y of Health & Hum Servs.*, No. 19-1051V, 2021 WL 3834198 (Fed. Cl. Spec. Mstr. July 27, 2021) (awarding $150,000 for pain and suffering). That individual also had significant medical comorbidities, including hypertension and recurrent oral cancer (from which he ultimately passed away). The initial treatment period was more severe and required 12 days of in-patient rehabilitation. Upon discharge, his treatment consisted of physical therapy (43 sessions) over ten months until he passed away from cancer. Mr. Vallee had a less severe initial treatment phase, but also attended more therapy over a longer period of time.

Balancing the severity of a GBS injury and Mr. Vallee's personal loss against the relatively low severity of his moderate disease course and treatment requirements, and considering the arguments presented by both parties, a review of the cited cases, and based on the record as a whole, I find that **$160,000.00** in compensation for actual pain and suffering is reasonable and appropriate in this case.

## Conclusion

For all of the reasons discussed above, and based on consideration of the record as a whole, **I award Petitioner a lump sum payment of $162,090.30 (representing an award of $160,000.00 for past pain and suffering, and unreimbursed expenses of $2,090.30) in the form of a check payable to Petitioner.**

This amount represents compensation for all items of damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[9]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u><br>
Brian H. Corcoran<br>
Chief Special Master

---

[9] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by each filing (either jointly or separately) a notice renouncing their right to seek review.